## Case No. 15,151.

### UNITED STATES v. FOURTEEN PACKAGES OF PINS.

[1 Gilp. 235.] 1

District Court, E. D. Pennsylvania. March 5, 1832.

CUSTOMS DUTIES—UNDERVALUATION—FORFEITURE—TRIAL—JURY.

1. Where a seizure is made on land under the laws of impost. the claimant has a right to a trial by jury.
[Cited in Waring v. Clarke, 5 How. (46 U. S.) 486; U. S. v. Athens Armory, Case No. 14,-473.]

2. On an information for forfeiture of goods, subject to ad valorem duty, the appraisement of the public appraisers is a necessary and preparatory proceeding. and is prima facie evidence.

3. The assistant appraisers of goods subject to ad valorem duty, under the act of May 28, 1830 [4 Stat. 409], are in aid of those under the act of March 1, 1823 [3 Stat. 729], and an appraisement by each set is not necessary.

4. A false valuation in an invoice of goods subject to ad valorem duty, is a price charged in the invoice. less than the fair and just buying and selling prices, at the time and place where the invoice was made up.

5. To subject goods to forfeiture, for a false valuation, it must be accompanied by a fraudulent intent and design.

6. Where a new penalty is imposed, for a violation of the laws of impost previously defined, it may be enforced, though unknown to the claimant at the time of the violation.

7. Where, on an information for forfeiture, a claim and answer are filed by an agent and consignee, for the owner, and the jury are sworn to try an issue between the United States and the owner, the court will not. after verdict, grant a new trial, on the ground that the jury were incorrectly qualified.
[Cited in Seabury v. Field, Case No. 12,575.]

8. It is no invasion of the privilege of the jury for the court to present to them their views of the nature, bearing. tendency, and weight of the evidence.
[Cited in Nudd v. Burrows, 91 U. S. 439.]
[Cited in Territory v. Scott, 7 Mont. 407, 17 Pac. 629.]

9. The court are not bound to notice in the charge, a point of law embraced in the argument, unless their opinion upon it was explicitly required.

10. A juror ought to disregard his private knowledge, and to render his verdict solely on the legal and open testimony of the cause.

1 [Reported by Henry D. Gilpin, Esq.]

On the 17th September, 1830, the attorney of the United States for the Eastern district of Pennsylvania, filed an information against thirteen cases of pins, and one case of needles, imported into the port of Philadelphia, on the 4th August, 1830, from Liverpool in England, on board of the ship Alleghany. The information alleged, that the said goods were subject to ad valorem duty, and that the invoice thereof, and the packages themselves, were made up with intent, by a false valuation, to evade and defraud the revenue of the United States, whereby the same were forfeited; and due process of law for the condemnation of the goods in question, was prayed for. On the 12th November, 1830, William C. Cardwell and John Potter filed a claim to the said fourteen packages, as consignees of the same from, and for and on behalf of, their consignors Kirby, Beard & Kirby, of London, by whom, as they alleged, the said packages were in the regular course of business shipped from Great Britain and consigned to them. In answer to the information, the claimants denied that the invoice and packages were made up with intent, by a false valuation, to evade and defraud the revenue; and they submitted that if the allegation to that effect were true, it would not authorise a forfeiture, but only a reappraisement and increased duty under the act of congress of March 1, 1823. On the 8th April, 1831, the case came on to be tried before the district court, sitting as a court of admiralty and maritime jurisdiction. under the provisions of the ninth section of the act of September 24, 1789 [1 Stat. 76].

Mr. Dallas, Dist. Atty., for the United States, offered evidence in support of the allegations set forth in the information. In the course of this evidence. it appeared that the fourteen packages had not been seized by the officers of the revenue. until after they had been landed. and that the first suspicion of fraud arose on an examination of them in the custom house stores.

Mr. Scott, for claimants.

Upon this evidence the case cannot be tried before the court, as one of admiralty and maritime jurisdiction, but the claimants are entitled to a trial by jury. It is the place of seizure and not of committing the offence that decides the mode of trial. The ninth section of the act of 24th September, 1789, reserves to the parties the right of a common law remedy, where the common law is competent to give it, which is the case here. 1 Story's Laws, 56 [1 Stat. 76]; U. S. v. La Vengeance, 3 Dall. [3 U. S.] 297; U. S. v. The Betsey and Charlotte, 4 Cranch [8 U. S.] 443; Whelan v. U. S., 7 Cranch [11 U. S.] 112; The Sarah, 8 Wheat. [21 U. S.] 394; The Margaret, 9 Wheat. [22 U. S.] 427; Clark v. U. S. [Case No. 2,837]; The Isabella [Id. 7,101]; U. S. v. Nine Packages

of Linen [Id. 15,884]; U. S. v. One Case of Hair Pencils [Id. 15.924].

On the 17th June, HOPKINSON, District Judge, decided for the claimant. that as it appeared that the seizure in this case was made upon the land, it was to be tried by a jury. It was therefore ordered. that it be set down for trial by a jury, and that the information and claim be so amended as to be made conformable to an issue to be so tried.

On the 5th March. 1832, the case came on for trial before HOPKINSON. District Judge, and a special jury.     .

Mr. Gilpin, Dist. Atty.. for the United States.

This information was founded on the fourth section of the act of congress of the 28th May, 1830, which is as follows: "The collectors of the customs shall cause at least one package out of every invoice, and one package at least out of every twenty packages of each invoice, and a greater number should he deem it necessary, of goods imported into the respective districts. which package or packages he shall have first designated on the invoice to be opened and examined, and if the same be found not to correspond with the invoice, or to be falsely charged in such invoice, the collector shall order forthwith all the goods contained in the same entry to be inspected; and if such goods be subject to ad valorem duty, the same shall be appraised, and if any package shall be found to contain any article not described in the invoice, or if such package or invoice be made up with intent by a false valuation. or extension or otherwise to evade or defraud the revenue, the same shall be forfeited." And the fifteenth section of the act of 1st March, 1823, and so much of any act of congress as imposes an additional duty or penalty of fifty per cent. on duties on any goods appraised at twenty-five or ten per cent. above their invoice, are repealed. 3 Story's Laws, 1887 [3 Stat. 735]; Pamph. Laws 1830, p. 106. Evidence was then given of the invoice of the goods in question, made by the manufacturers, Kirby, Beard & Kirby, on the 2d June, 1830, and their arrival in Philadelphia, and entry by Cardwell and Potter as consignees of the manufacturers and owners, on the 7th August following. It was also proved that one of the packages, on being opened and examined, was found to be falsely charged in the invoice, and therefore all the packages were examined and appraised by the public appraisers. On their appraisement being offered, it was objected to.

Mr. Scott, for claimants.

This appraisement is not evidence, because it is improperly made, and because it is no proof of fraudulent intent.

1. By the act of 1st March. 1823, two principal appraisers were appointed for this port, who are the persons by whom this appraisement was made. The act of 28th May, 1830, on which this information is founded. declares that the secretary of the treasury may appoint two assistant appraisers, whose appraisements are to be revised and corrected by the former. It evidently contemplates such a previous examination which did not take place in this instance. It is to give the merchant the benefit of appeal and revision. Though it is said these assistants "may" be appointed. it has been settled that such permission is compulsory in its character where the public have an interest in its fulfilment. 3 Story's Laws, 1887 [3 Stat. 735]; Rex v. Inhabitants of Derby, Skin. 370; Backwell's Case, 1 Vern. 152; Rex v. Barlow, 2 Salk. 609; Com. v. Gable, 7 Serg. & R. 426; Schaeffer v. Jack, 14 Serg. & R. 429; Newburgh & C. Turnpike Co. v. Miller, 5 Johns. Ch. 112; Malcom v. Rogers. 5 Cow. 188.

2. An appraisement is no evidence on a question of forfeiture; it is meant to ascertain what duties are to be charged; it is no evidence of value at the time and place of exportation.

HOPKINSON. District Judge, stopped the district attorney, who was about to reply, and admitted the evidence.

The act of 1st March, 1823, appoints two appraisers for this port; that provision of it has never been repealed expressly, but it is said to be virtually, by the section of the act of 28th May, 1830, which authorises the secretary of the treasury to appoint two assistant appraisers. I think not. The object of the last act was the public convenience; it authorised the appointment of four assistant appraisers in New York and two here. What are they to do, and what are their power and duty? To examine such goods as the principal appraisers may direct, should they be unable themselves to perform all that may be required, and need such additional aid. On the construction which has been given, the public business will not be assisted, but delayed. Every case may be subjected to a double examination. The business will not be distributed among the four ˉofficers, but must always pass under the notice of two in the first instance, with a correction or revision of the other two. By a double process the assistants are to report to the principals, and the principals to the collector. Such is not the intention of the law; these officers are to act for and under the principal appraisers when necessary; they are to be appointed by the secretary of the treasury when the public service requires an increased number of appraisers; but there is nothing compulsory upon him to make such increase, and nothing which makes them independent of, or distinct from the principal appraisers in the manner contended for. As to the second objection, it is

sufficient to observe that this appraisement is required by the act of congress as the foundation of a forfeiture, as a preparatory step or proceeding in the course of forfeiture. It is therefore prima facie evidence, and as such properly introduced; but it is not conclusive; it may be rebutted or disproved by the claimants.

'Mr. Gilpin, for the United States, in continuation.

The appraisement in question was then read together with a reappraisement by the same officers. The claimants being dissatisfied, a third appraisement was made by the same officers together with two merchants, selected by the claimants and approved by the collector, according to the provisions of the eighteenth section of the act of 1st March, 1823. This was also read; as was a smaller invoice or bill of sale of the same goods left at the custom house, as was alleged, by accident. Several witnesses, who had imported similar articles and received invoices, to which they referred, were examined to prove that the invoice in question was lower than the current market value at the time and place of exportation. 3 Story's Laws, 1888 [3 Stat. 736].

Mr. Scott, for claimants.

Testimony under a commission to England was read to prove, that the invoice prices were the actual value at the time when and place where it was made. But besides, it was said, the preparatory steps necessary to a forfeiture had not been taken. The appraisement by the merchants was under the act of 1st March, 1823. Where this act is inconsistent with that of 28th May, 1830, it is repealed pro tanto. The latter act prescribes a new mode of reappraisement where the owner is dissatisfied, the old mode is therefore repealed, yet it was adopted here. To sustain a forfeiture the law must be strictly complied with. To show that these goods are falsely valued, we must ascertain what the law means by a true valuation. This varies in the different acts relative to ad valorem duties. That of 3d March, 1817, 3 Story's Laws, 1633 [3 Stat. 369], fixes "the net cost of the article at the place whence imported" as the test; that of 20th April, 1818, 3 Story's Laws, 1680 [3 Stat. 433], "the actual cost;" that of 1st March, 1823, 3 Story's Laws, 1885 [3 Stat. 729], "the actual cost, if the goods have been actually purchased, or the actual value if the same have been procured otherwise than by purchase, at the time and place when and where purchased or procured;" that of 19th May, 1828, "the actual value at the time purchased, and place whence imported." The invoice, therefore, must contain the "actual value" of the goods to the manufacturers at the place of manufacture, and at the time they sent them to their agents here. It does so. We have their oath annexed to the in-

voice; and it is entitled to great weight. There is no evidence even attempting directly to disprove this. As to any fraudulent intent to violate the act of 28th May, 1830, it could not exist, for their invoice is dated 2d June, 1830, long before they could have known of its passage. Pamph. Laws 1828, p. 47; The Isabella [supra]; U. S. v. Nine Packages of Linen [supra]; U. S. v. Hayward [Case No. 15,336].

HOPKINSON, District Judge (charging jury). The information charges that the goods in question, being subject to an ad valorem duty, were imported into Philadelphia from Liverpool, in •the ship Alleghany, and that the invoice and packages were made up with intent by a false valuation to evade and defraud the revenue of the United States. Two subjects or questions are thus submitted to your inquiry and deliberation: (1) Is the valuation of these pins, as it appears in the invoice, a false valuation? (2) If it is so, then, were this false valuation and the invoice made up with intention to defraud the revenue of the United States? The information is founded on the fourth section of the act of 28th May, 1830, which has been frequently referred to. The proof in support of the allegations of the information consists of official documents and parol testimony. You have before you a paper called the small invoice. It is dated at London, on the 2d of June; not at Liverpool, where the goods were shipped. It is for you to say what this paper is. Why was it prepared, and what use was to be made of it? It is said to be an estimate made for the export entry; but how could this be, as the particulars were not then known? You will make these inquiries and satisfy yourselves. The regular invoice is dated on the 24th of June. Both papers came with the ship. The first paper is not in form an invoice; the second is in the usual form. The first is like a common bill of sale, headed, "Messrs. Cardwell & Co. of Philadelphia, bought of Messrs. Kirby, Beard & Kirby." In it the valuation of the goods is higher than in the regular invoice. Why was this done? Does it afford ground for a reasonable suspicion, that the first paper contains the real value of the goods, and the price at which they were actually sold; and that the second was prepared for the custom house entry? It was on the second or regular invoice that the entry here was ordered, and the question is on this invoice. Does it exhibit a true or a false valuation of the goods? If it be true, then any suspicion arising from the other, is of no importance: for, if the goods were entered at their true value, by a true invoice, there has been no forfeiture or violation of the law. On the other hand, if this is a false invoice, then the character and object of the other invoice may be important in deciding upon the intention of the second. (The two papers were here referred to, and the prices particularly stated.) The first proceeding under the

law, was the appraisement made by the official appraisers. Compare their valuation of the goods with that given in the invoice. The second appraisement was made by the special appraisers, to whom were added two others appointed by the consignees. This was done under the eighteenth section of the act of 1st March, 1823. From the appraisements, and from the evidence given to the jury by the appraisers, it appeared that extraordinary pains were taken to ascertain the value of the goods, and every means of information resorted to. The attention of the appraisers was particularly drawn to the proper inquiry, that of the value of the goods in the London market; they made all allowances for any change in the market, for any difference in the quality and weight of the pins. You will compare this with the previous appraisement, and can hardly fail to obtain a satisfactory knowledge of the true value of these articles, in the London market, at the time of their exportation.

In addition to these appraisements, numerous witnesses have been examined at the bar, dealers in the article, importers at the time of this importation, as well as before and after it. They produced their invoices, and stated the prices at which they made their purchases. Some of them made their importations at the same time with the claimants, from the same place, and even from the same manufactory. (The judge turned to the evidence of these witnesses, making observations explanatory of each.) You will also give due attention and weight to the testimony on the part of the claimants. It cannot have escaped your observation, that among the numerous importers of pins in this city or country, they have not produced one witness, to verify or support the prices of their invoice; not one importation or invoice; nor a single sale at these prices. They have a commission to England; but they have examined only two witnesses under it, although dealers in, and manufacturers of the article. They have not shown a single sale in London, or any part of England, of any pins of any quality, at the prices of their invoice, or near to them. You have, under this commission the testimony of Donald McIlvaine, with his opportunities of knowledge on the subject, as they appear from his own answers. His evidence, too, is hard to be reconciled with the letter of the claimants to John Bury, and their own invoice sent to him. The other witness, William Broughton, is a pin maker in the employ of the claimants; but says he has no exact knowledge of the prices. All the evidence which has been given of prices, or market value, or fair market value, or current value, or true value, or actual value, is to bring you to the same conclusion, to a satisfactory answer to the question you are trying, to wit, is the valuation of these goods in this invoice a "false valuation," which is the offence described in the act of congress of 1830, on which this information is founded? Were

these goods really worth more in the London market? Were the buying and selling prices higher in that market than those charged in this invoice, at the time when this invoice was made up? However the phrases may vary in the different acts of congress, current value, actual value, or market value, the inquiry with you always is the same; does this invoice contain a true valuation of these pins, or a false one? The phraseology of the laws is important on this issue, only as it may assist you in answering and deciding the question whether these pins, or similar pins, were bought and sold in the London market, in June, 1830, at these prices? Or is the valuation false and untrue, and the prices not those at which such pins were bought and sold at that time and place? You are not to take a sale under particular circumstances which may have depressed or raised the price, but the fair and just price of buying and selling in the market.

If, upon a liberal and impartial view of the whole evidence, you shall come to the conclusion that the valuation in the invoice is false, it will then be your duty to inquire whether this has happened by accident, inadvertence, or mistake, or with intent to evade and defraud the revenue of the United States. The fact is not enough; it must be accompanied by the fraudulent intent and design. This is not often capable of direct, express proof, but the intention of the party, as in other similar cases, must be collected from all the facts and circumstances. In this inquiry, the amount of the undervaluation is important, because, if great, it is less likely to be a mistake, and because the difference offers a sufficient temptation in the diminution of the duties, to account for it. This is the part of the case peculiarly belonging to your office, and which you will make with all necessary caution, as the character of the claimants has been strongly pressed upon you to repel the suspicion of a deliberate, contrived fraud. How far these foreign manufacturers regard our revenue laws, or think there is much guilt in getting an advantage of them, you can better judge than the court. We have reason to believe that some dealers think every thing fair in a contest with a custom house, especially abroad. It is due to the consignees of this shipment, Messrs. Cardwell and Potter, to say that if there is any thing wrong in the business, they are not implicated in it. They entered the goods by the invoice which came to them with the goods.

The jury found a verdict for the United States.

On the 15th March, 1832, a motion was made on behalf of the claimants for a new trial, and the following reasons were filed:

I. Because the jury were sworn to try the issue between the United States and Kirby, Beard & Kirby, claimants, whereas no such issue exists upon the record.

II. Because the jury were incorrectly qualified.

III. Because the court erred: (1) In admitting in evidence the three several appraisements, for any other purpose than to prove the United States had taken the steps necessary to seizure (2) In admitting them in evidence for any purpose. (3) In admitting in evidence the invoices of John Siter, William Chaloner, Joseph Brown, and John Bury.

IV. Because the court, in the charge to the jury, erred: (1) In instructing them that there was nothing in the objection that the act of 28th May, 1830, was unknown to Kirby, Beard & Kirby, before they shipped the pins. (2) In instructing them that the appraisements were properly made, and the act of 28th May, 1830, did not, quoad hoc, repeal the section in the act of 1st March, 1823, relating to appraisement. (3) In instructing them that the paper called the small invoice was a suspicious paper, a false one, and such as to throw doubt on the transaction. (4) In instructing them that the appraisements were made with great care, and therefore entitled to great weight in their consideration. (5) In instructing them to consider John Siter's testimony as of special importance.

V. Because the court did not charge the jury on the rule of law pressed in argument by the counsel of the claimants, in reference to the testimony of Donald McIlvaine, viz. that he was entitled to belief unless impeached, and that no such attempt having been made, he stood before the jury entirely worthy of credit; but on the contrary, simply remarked, "it was strange he did not purchase at the prices named."

VI. Because the court told the jury that the claimants had known all the testimony of the United States for eighteen months, and yet produced none to contradict it; there being no proof of that knowledge given at the trial, and the court being entirely mistaken as to the fact.

VII. Because the general tenor of the charge of the court was such as to take away the question of fact from the jury.

VIII. Because the court remarked that it was extraordinary Kirby, Beard & Kirby, should have examined Broughton, a man in their own employ.

IX. Because the court erred in saying: (1) That the various expressions in the acts of congress on the subject of value and the computation of ad valorem duties, were unimportant in the case. (2) That to prove value at London, value at Manchester, Liverpool, and Warrington, could be a guide.

X. Because when the jury came in, and one of them asked whether, in making up his opinion, he was at liberty to avail himself of his own previous knowledge, the court replied "Your oath is to decide according to the evidence, this is the only proper guide for your decision."

XI. Because the court subsequently intimated to the same juror, that unanimity was not to be expected, and that he should endeavour to come to the opinion of his fellows.

On the 31st March, 1832, this motion was argued by Mr. Scott, for claimants, and Dist. Atty. Gilpin, for the United States.

Mr. Scott, for claimants. The following cases were cited: Reniger v. Fogossa, Plow. 12; Partridge v. Strange, Id. 83; The Cotton-Planter [Case No. 3,270]; U. S. v. Nine Packages of Linen [supra]; Doebler v. Com., 3 Serg. & R. 237.

Mr. Gilpin, for the United States. The following cases were cited: 3 Bl. Comm. 375; U. S. v. Williams [Case No. 16,723]; Smith v. Parkhurst, Andrews, 321.

•

HOPKINSON, District Judge. Numerous reasons have been filed in this case against the verdict, and to support the motion on the part of the claimants, for a new trial. Some of them have not been touched, or insisted upon in the argument on the motion, and therefore will not require a particular attention from the court. Such as have been maintained in the argument will be considered and disposed of.

The first and second reasons are: "Because the jury were sworn to try the issue between the United States and Kirby, Beard & Kirby, claimants, whereas no such issue exists upon the record; and because the jury were incorrectly qualified." I have no doubt that the jury were properly sworn, both as regards the real parties in interest, and as they appear upon the record, but I shall put the dismission of this exception on another ground. The first four jurors called to the book were sworn to try the issue between the United States and Fourteen Packages of Goods, whereof Cardwell and Potter were claimants. The counsel for the claimants immediately interrupted the clerk, and observed to him that Cardwell and Potter were not the claimants, but the agents of the claimants, who were Kirby, Beard & Kirby, and that the jury should be so sworn. Under this direction, to which the district attorney assented, the four jurors were re-sworn according to it, and all the other jurors were also so sworn. It is now objected to the verdict, that the jury should not have been so sworn or qualified; that Kirby, Beard & Kirby are not the claimants on the record, but the issue was between the United States and Cardwell and Potter, claimants. Can it be imagined that a court, holding the power to set aside a verdict and grant a new trial, for the purposes of justice, would exercise that power under such circumstances, when the error, if any, was the error of the party who would now take advantage of it; and which is confessedly a mere matter of form, a pure technicality, having no influence or bearing on the merits of the case? It is impossible.

The next, or third class or head of reasons, relates to alleged errors of the court: (1 and

2) "In admitting the three appraisements to be read in evidence." This exception was passed over in the argument. Indeed I know not what could have been said for it, as the appraisements in question were not only a part of the proceedings directed in such cases by the act of congress, but were read to the jury on the express call of the counsel of the claimants. (3) "In admitting in evidence the invoices of John Siter, William Chaloner, Joseph Brown, and John Bury." As to the invoices of Siter, Chaloner, and Brown, they were neither offered nor given in evidence. These gentlemen had severally made importations of articles similar to those in question, and they were examined as to the prices they had paid for them. They did refer, without objection, to their invoices to assist their memory in ascertaining these prices; but the invoices were not read to the jury, nor, in any other manner, made a part of the evidence of the cause. No exception was taken or noted by the claimants to the decision of the court on the admissibility of the question, what were the prices paid by the witnesses for their articles, although the question was objected to; and as to the invoices, they were used in no other way than that mentioned. The invoice of John Bury was offered and read in evidence, and also the letter which accompanied it, because both the invoice and the letter came from the claimants, and were clearly evidence against them. If this were not so, their admission can afford no ground of exception to the verdict, as they were given to the jury without objection.

These are all the reasons founded on supposed errors of the court in the course of the trial.

The next class, the fourth, relates to alleged errors in the charge to the jury: (1) "In instructing the jury that there was nothing in the objection that the act of 28th May, 1830, was unknown to the house of Kirby, Beard & Kirby before they shipped the goods in question." I cannot withhold the expression of my surprise that this reason should be seriously urged to the court, however expedient it might have been to address it to a jury, to enlist their feelings for the claimants, on a supposed ignorance of the law they were offending. What are the purport and effect of the law of 28th May, 1830? Do they create a new offence, or make that unlawful, which was before lawful? Certainly not so. The offence committed was always a violation of the laws of the United States, visited by certain and severe penalties. But these penalties were found not to be adequate to prevent the offence: the temptations to cupidity were too strong to be restrained by an increase of duties on the goods which were falsely invoiced. The penalty was therefore enlarged to an entire and absolute forfeiture of the goods. The plea of the claimants is, we knew that by making up this false invoice, with intent to defraud the revenue of the United States, we were violating a law of the United States, but we sup-

posed that in case of detection we should suffer only by an increased charge upon our goods, and not by their forfeiture, and therefore, we are innocent: therefore we should be acquitted of all penalty, and the jury should so have rendered their verdict. This is a most extraordinary course of reasoning in law or morals. Besides, did Messrs. Kirby, Beard & Kirby require to have a knowledge of the enactments of the act of 28th May, 1830, to teach them that fraud and perjury are crimes every where, under all circumstances, and upon all subjects? Yet it was only by and through fraud and perjury that the offence, charged and proved upon them by the verdict of a most respectable and intelligent jury, could have been perpetrated. But, in their code of morals, fraud and perjury are nothing, unless they are to be followed by a forfeiture of goods. These remarks are reluctantly made; but they are rendered necessary by the perseverance and zeal with which this reason has been pressed, first upon the jury, and now again upon the court. (2) The second reason under the fourth head relates to the appraisements, and was not noticed in the argument. (3) The third reason under the same head, which relates to the small invoice, was also passed by in the argument. As to that paper, I told the jury, that there was a mystery about it, which had not been explained, not merely because it gave a different valuation to the goods from the regular invoice by which the goods were offered for entry, but that it purported to be a bill of sale from Kirby, Beard & Kirby, to Cardwell and Potter, when in truth no such sale was made, but the goods were sent to this country for and on account of Kirby, Beard & Kirby; and Cardwell and Potter were but the consignees, having no ownership in them and no interest but as consignees. I stated other circumstances which threw a cloud of suspicion over this part of the case, together with the explanations that were offered on the part of the claimants; and left the whole to the jury for their consideration with this observation; "The jury must say what this paper means, and whether it affords ground for reasonable suspicion of an unfair intention." (4) The fourth error, under this head, is "in instructing the jury that the appraisements were made with great care, and were therefore entitled to great weight in their consideration." As these appraisements were received in evidence, I cannot perceive in what was the error or the mischief, to say that they had been made with great care. The appraisers appeared before the jury, and made the same appraisements under their oaths taken here, as they had under their official oaths taken at the custom house. They explained particularly the time, which was several days, occupied in the business, and the means they took to obtain information, to assist them in ascertaining the true value of the articles at the time and place required by the law. Was there any error in telling the jury that ap-

praisements thus made, for whatever purpose they were given in evidence, were entitled to their respect in proportion to the care with which they had been made? I think not. (5) The fifth point, under this head, has not been insisted upon; indeed it is a mistake in point of fact. The jury were told to consider John Bury's testimony of special importance, because it came from the claimants themselves; but this was not said as to evidence of the United States.

We come now to the fifth general head: "Because the court did not charge the jury on the rule of law, pressed in argument by the counsel of the claimants, in reference to the testimony of Donald McIlvaine, viz. that he was entitled to belief unless impeached, and that no such attempt having been made, he stood before the jury entirely worthy of credit; but on the contrary remarked, that it was strange he did not purchase at the prices named." If the judge had instructed upon this point, as the exception requires him to do, he might indeed have been charged with invading the rights of the jury. If there be any thing which peculiarly belongs to them in the trial of a cause, it is to judge of the credibility of witnesses, and it is not for the court to direct or instruct them who is entitled to belief, or who stands before them entirely worthy of credit. As to the evidence of Donald McIlvaine, if I had told the jury my opinion of it, it would have been, that it was impeached by all the evidence of the cause, and by circumstances testified by himself. I repeat now what I said to the jury; it is difficult to reconcile the evidence of Donald McIlvaine with his conduct; it is difficult to discover why, if he were desirous of purchasing goods for himself, and had orders to do so from others, he did not take them at the prices he says they were offered to him for, as these prices were certainly lower than any other sales or offers we had any account of, and much lower than the actual sales made about the same time. It is difficult also to reconcile his testimony with the letter and invoice received by John Bury, from Kirby, Beard & Kirby, in which the pins are charged at a much higher price than Donald McIlvaine says the same house offered them to him for, at or near the same time, and which prices Kirby, Beard & Kirby assure Mr. Bury were their lowest. After these remarks I told the jury, that nevertheless, Mr. McIlvaine had sworn positively to the fact, and they would give the weight they thought proper to his testimony, under all the evidence and circumstances of the case. There is another answer to this exception to the charge of the court, which I mention, not because it is necessary in this case, but on account of its general importance. If the counsel in a cause desire to have the opinion of the court given to the jury upon any point or matter of law, it is their duty to state it explicitly, and to ask the opinion of

the court, or they cannot make the silence of the court, or an omission to instruct the jury upon that point, a ground for a new trial. Misdirection is always a good ground, but not an omission to direct, when no direction is required. It is not enough to say, that the counsel "pressed a point in his argument." He must do more. No court is bound to give specific answers to, or notices of all the matters the counsel may think it expedient to press upon them in the argument. When a charge or opinion of the court is wanted on a particular point, it must be particularly stated and asked for. Such is the practice, and such it ought to be, or verdicts would be perpetually in danger from concealed objections.

The sixth general reason is, "because the court told the jury that the claimants had known all the testimony of the United States for eighteen months, and yet produced none to contradict it; there being no proof of that knowledge given at the trial, and the court being entirely mistaken as to the fact." The entire mistake as to the fact is found in the exception and not in the court. I speak not of my personal knowledge that this case was formerly heard before me, and proceeded on to the close of the testimony on the part of the United States, when it was dismissed on discovering that it was a case for a jury and not for the judge alone. But on this trial of the cause, the former hearing was repeatedly referred to by the counsel on both sides. Indeed in the cross examination of some of the witnesses of the United States, they were questioned by the claimants' counsel as to what they had said, and as to the evidence they had given on the former hearing I reminded the jury of this fact, that there had been a former hearing at which these witnesses had been fully examined in the presence of the claimants' counsel and cross examined by them; and remarked to them that by this means the claimant had been made acquainted with the evidence by which he was now assailed, and had had full time to repel it, but that he had not produced a single importer of pins in the United States, to prove that he had purchased pins at the prices of his invoices, nor any manufacturer in England to say that he had sold them at such prices. I see no error or extension of the right of the court over the jury box in these observations, or departure from the evidence of the case.

The seventh reason is, "that the general tenor of the charge was such as to take away the question of fact from the jury." The generality of this exception admits only of a general answer, and might be dismissed for the reason that it specifies nothing; but I will take the occasion to state what I believe to be the right and duty of a court in charging a jury, beyond which not a step was taken in this case. That the question of fact should not be taken from the jury

by the court, is too clear to be the subject of a discussion; but I hold it to be equally certain, that it is the right and duty of the court to give its aid to the jury in explaining the evidence, in collating its various parts; in drawing their attention to the most material facts in proof and their application to and bearing upon the important points of the case: in ascertaining, between contradictory testimony, which is best entitled to belief; with such comments as will clearly explain to them the views taken by the court of the case. All that is necessary is, that the jury should distinctly and explicitly understand that such observations are to be received by them, merely for the purpose of assisting them in their deliberations, of recalling their recollection to the facts testified, and of turning their attention to the true points of inquiry; but that the decision to be made upon the evidence belongs altogether to them, and that no direction or authoritative instruction is intended to be given concerning them. These doctrines are fully recognised and strongly enforced by Starkie (1 Starkie, Ev. 440). That respectable author says: "The practice of advising the jury as to the nature, bearing, tendency, and weight of evidence, although it be a duty which, from its very nature, must be, in a great measure, discretionary on the part of the judge, is one which does not yield in importance to the more definite and ordinary one of directing them in matters of law. The trial by jury is a system admirably adapted to the investigation of truth, but, in order to obtain the full benefit to be derived from the united discernment of a jury, it must be admitted to be essential that their attention should be skilfully directed to the points material for their consideration." After some further remarks, this author adds that, "jurors unaccustomed, as they usually are, to judicial investigations, require, in complicated cases, all the aid which can be derived from the experience and penetration of the judge, to direct their attention to the essential points, and enable them to arrive at a just conclusion." Again, after saying that the jury should have "excluded from their consideration all such evidence as is likely to embarrass, mislead, or prejudice them in the course of the inquiry," he proceeds: "Much yet remains to be done of a nature which cannot be defined; to divest a case of all its legal incumbrances; to resolve a complicated mass of evidence into its most simple elements; to exhibit clearly the connection, bearing, and importance of its distinct and separated parts, and their combined tendency and effect, stripped of every extrinsic and superfluous consideration, which might otherwise embarrass or mislead a jury; and to do this, in a manner suited to the comprehension and understanding of an ordinary jury, is one of the most arduous as well as the most important duties incident to the judicial office." In this powerful delineation of what a charge to a jury ought to be, who is not reminded of the clear and luminous order, of the strong and satisfactory discriminations; of the admirable combinations of facts and circumstances, with which Judge Washington discharged this "most arduous as well as most important duty of the judicial office?"

I have quoted the opinions of this author, which he sustains by authority, thus at large, because I think them replete with good sense and practical utility; and that it is only by following them that the trial by jury will be attended by the invaluable advantages which belong to it. It is a solecism to say that a court may set aside the verdict of a jury, if, in the opinion of the court, it be contrary to evidence, and yet that it is an invasion of the right of the jury over the facts, if the court should present their views of the evidence in order to prevent the error instead of correcting it. In the case in question no instance has been pointed out in which the court exceeded or even filled the space here allowed. The evidence given on the trial was arranged in the order of the points to be considered and decided, but its effect was left fully and without prejudice to the jury. The witnesses were named, and the circumstances alluded to which might detract from or give weight to their testimony; but their credibility, positive and comparative, was distinctly submitted to the judgment of the jury; and finally the allegation of the exception that "the charge of the court was such as to take away the question of fact from the jury," has not been supported by any reference to the charge, or any part of it, found in the notes of the judge, or in those of any of the counsel, nor by the recollection of either as to any fact so taken from the jury.

The eighth reason is, "because the court remarked that it was extraordinary that Kirby, Beard & Kirby should have examined Broughton, a man in their own employ." If any such remark had been made by the court, it would be an extraordinary reason for setting aside a verdict. But no such remark was made. It was said that it was extraordinary they had not examined some other witnesses on the question of market value, but had relied upon him, especially as he knew nothing of the market price and value of the article, but was a workman or manufacturer, and neither a buyer nor seller of the article.

The ninth reason is, "because the court erred in saying, that the various expressions in the acts of congress, upon the subject of value and the computation of ad valorem duties, were unimportant in the case; and in saying that to prove the value in London, value at Manchester, Liverpool, and Warrington, could be a guide." We find in this exception the same error, which attends so many of those we have to consider in this

case, that is, an entire mistake of what was said by the court. I will transcribe from my notes what I did say to the jury on this subject: "All the evidence which has been given of prices, or market value, or fair market value, or current value, or true value, or actual value, is to bring you to the same conclusion, to a satisfactory answer to the question you are trying, to wit, is the valuation of these goods in this invoice a 'false valuation,' which is the offence described in the act of congress of 1830, on which this information is founded? Were these goods really worth more in the London market? Were the buying and selling prices higher in that market than those charged in this invoice, at the time when this invoice was made up? However the phrases may vary in the different acts of congress; current value, actual value, or market value; the inquiry with you always is the same; does this invoice contain a true valuation of these pins, or a false one? The phraseology of the laws is important, on this issue, only as it may assist you in answering and deciding the question, whether these pins, or similar pins. were bought and sold in the London market. in June, 1830, at these prices?" I see no error in any part of these remarks. As to the other branch of this exception, that the court erred in saying "that to prove value at London, value at Manchester, Liverpool, and Warrington could be a guide," the jury were certainly kept in mind that they were to inquire into and decide upon the value at London, and that the prices and value at other places mentioned, of which evidence was given on both sides, were to be considered by them only as auxiliary to that purpose, and they might make it so, as the witnesses had stated what was the ordinary difference of prices in these markets, when any existed. Some illustrations were given to show that the evidence was not to be confined literally to the time and place of exportation, or it would tie us down to the hour, and to the exact spot on which the manufactory or warehouse might stand.

The tenth reason is, "because when the jury came in, and one of them asked whether in making up his opinion, he was at liberty to avail himself of his own previous knowledge, the court replied: 'Your oath is to decide according to the evidence: that is the only proper guide for your decision.'" The language used by the court to the juror was not precisely that stated in the exception; although the difference may not be important. I am willing to give to my answer its full and fair meaning; such as was probably understood by him. It certainly was not, nor was it intended to be, a prohibition to the juror to avail himself of his knowledge of the subject; to his giving his verdict on any ground or for any reason he might think proper, on his own responsibility; but it was a strong intimation to him, that it was his duty to render his verdict on and according

to the evidence given in court, under oath, in the presence of the court, the parties and the public, and not to disregard such evidence in favour of his private knowledge or opinions, derived from more uncertain and unsafe sources. It would have been idle in the court to attempt to prohibit what it could not prevent, for a juror may give his verdict as he wills to do, and no body has a right to question him for his reasons. All the court can do is to inform him what the law expects and his duty requires of him, that is, well and truly to try the issue submitted to him, and a true verdict to give according to the evidence; and it cannot be doubted that the evidence, intended by the law and the juror's oath, is the evidence openly given on the trial before the court. Certainly this is the true theory of the open public trial by jury, by witnesses, by evidence, in the presence of the court, of the parties, of the public, with the benefit of cross examination; and the usefulness and safety of this admirable mode of trial will be greatly impaired, if jurors are to understand that it is no usurpation of power, no violation of their duty, when they get secretly together in their private room, to put aside all the evidence of the cause, and bring together as the foundation of their verdict, all the opinions, prejudices, rumours and hearsays, which they may call their previous and personal knowledge of the subject. The same rule must be applied to criminal as to civil cases, and the accused can never be assured of safety, although the whole evidence given in his presence may testify his innocence, if he is to be tried secretly, by other evidence in the jury room.

These principles find ample support, and no contradiction from every authority in relation to them. In Tidd's Practice (page 936), speaking of the insufficiency of the writ of attaint as a remedy for a false verdict, it is said: "There are numberless cases of false verdicts, without any corruption or bad intention of the jurymen. They may have heard too much of the matter before the trial, and imbibed prejudices without knowing it." This hearsay and these prejudices are precisely what a juror might call, and conceive to be, a previous knowledge of the subject; and this error can be guarded against only by excluding them, as far as is practicable, altogether from the mind of the juror, and referring him, for his verdict, to the proper and legal evidence of the case. We find, every where, the principle sustained, that every thing which is to influence the verdict of a jury, should be openly delivered in the presence of the court. Thus in Hale's Pleas of the Crown (2 Hale, P. C. 306) it is said: "If a juryman have a piece of evidence, in his pocket, and, after the jury sworn and gone together, he showeth it to them, this is a misdemeanour in the jury." So, at page 307, it is said: "If the jury send for a witness to repeat his evidence that he gave openly in the court, it will avoid the

verdict." The same law is laid down in the case of Metcalfe v. Deane, Cro. Eliz. 189. Again, it is said by Hale: "If the jury, after their departure from the bar, desire to hear the testimony of a witness again, they may be sent for into court, and the witness may be heard again openly, where the court or parties may ask what questions they think fit." In an anonymous case (1 Salk. 405) it is said: "If a jury give a verdict on their own knowledge, they ought to tell the court so, that they may be sworn as witnesses; and the fair way is to tell the court, before they are sworn, that they have evidence to give."

In the case before us, the question asked by the juror and the answer given by the court are thus stated on my notes. They were read, at the time, to the juror, in the presence of the counsel, and agreed to be correct. "One of the jurors asks, 'whether he may avail himself of any previous knowledge, he has of the subject, in giving his verdict.' The court replied, 'The question is answered by the oath of the juror, to try the cause, and a true verdict give according to the evidence.'" I think I added, although it is not on my notes, that the evidence of a cause is that which is delivered on oath, in the presence of the court and the parties. The question was suddenly put to the court, and immediately answered, as I now think, with too much reserve, and that I might, and perhaps ought to have been more decided and peremptory in my instruction to the juror, to disregard his private knowledge, and to render his verdict solely on the legal and open testimony of the cause.

I am confirmed in this opinion, not only by the cases already referred to, but by others I shall now notice. When a remedy for a false verdict, or a verdict contrary to evidence could be obtained only by attainting the jury, a very severe proceeding against them, every presumption or possibility was resorted to in order to support the verdict, and save the jury from a judgment of attaint. But a salutary and reasonable change has taken place in the law of setting aside verdicts, since the practice of attainting jurors has been disused, and their mistakes are corrected by the more liberal and efficacious remedy of granting new trials. In Bacon's Abridgment (3 Bac. Abr. 778), speaking of attainting juries, it is said: "But to attaint them for finding contrary to evidence is not so easy, because they may have evidence of their own cognizance of the matter before them, or they may find, on distrust of witnesses, on their own proper knowledge." This is the law of the text; and the old authorities are given for it; but in a note it is thus modified and corrected: "If a jury give a verdict on their own knowledge, they ought to tell the court so: but they may be sworn as witnesses; and the fair way is to tell the court, before they are sworn, that they have evidence to give."

The anonymous case (1 Salk. 405), already referred to, is here cited. The modern doctrine is more explicitly stated in the first volume of Starkie on Evidence (page 405). He says: "Neither a judge nor juror can notice facts within his own private knowledge: he ought to be sworn and state them as a witness." A note informs us that the law was formerly otherwise; and the case of Partridge v. Strange, Plow. 83, is cited. The ancient doctrine was founded, as I have said, on the law of attaints. The note proceeds: "But this doctrine was again gradually exploded when attaints began to be disused, and new trials introduced in their stead. It is quite incompatible with the grounds on which new trials are every day awarded, viz. that the verdict was given without, or contrary to evidence." Afterwards, in the same volume (page 449), it is added: "It is now perfectly settled that a juror cannot give a verdict founded on his own private knowledge: for it could not be known whether the verdict was according to, or against evidence; it is very possible that the private grounds of belief might not amount to legal evidence. If such evidence were to be privately given by one juror to the rest, it would want the sanction of an oath, and the juror would not be subject to cross examination. If, therefore, a juror know any fact material to the issue, he ought to be sworn as a witness, and is liable to be cross examined, and if he privately state such facts, it will be ground of a motion for a new trial." In the third volume of Blackstone's Commentaries (page 374), the doctrine and reasons of Starkie are recognised as the law of that day. If such be the law, there was no error in the answer given by the court to the inquiry of the juror; at least, none of which the claimants can complain. The court might have been more explicit and direct, in cautioning the juror against making up his verdict on his previous or personal knowledge.

The eleventh and last ground of exception is a most striking misconception of the court, to wit, that the court intimated to the juror who made the foregoing inquiry, "that unanimity was not to be expected; and that he should endeavour to come to the opinion of his fellows." There is mistake in every part of this allegation. The remark which the court did make was addressed to the whole jury, and not to any particular juror. It arose on an occasion having no relation to the question asked as above by a juror; nor, according to my recollection, was it at the time when that question was put to the court, for the jury came in more than once before they gave their verdict. On one of these visits to the court, subsequent, as I think, to that on which the question was asked, but this is not material, one of the jurors expressed himself with much impatience, and in very strong terms, of the obstinacy of one of his fellows, alluding, as I suppose, to the very juror who had made

the inquiry of the court. It was then that I remarked, that it could hardly be expected that twelve men would at once agree upon any subject of any difficulty, and that it was a duty they owed to each other to exercise patience and forbearance in their discussions; to listen calmly to one another, and truly endeavour to come at last to the same opinion.

In making this laborious examination of these reasons for a new trial, I have been governed, as may be seen, not by the difficulties I found in them, but by my respect for the counsel who has considered and treated them as matters of importance.

Rule to show cause why a new trial should not be granted, discharged.